May I proceed? Yes. Good morning, your honors. May it please the court. Eric Guzman representing Martha Santiago, the defendant appellant. I will watch my own clock and attempt to reserve five minutes for rebuttal. I would like to proceed by first addressing the issue of whether the trial court should have granted a mistrial after the jury unequivocally expressed itself as being hopelessly deadlocked and inform the court that they believed no further time would help. More specifically, your honors, the note from the jury informed the trial court of its numerical of its numerical split. And more specifically, of which way the split was positioned, specifically that 11 were voting to convict and one was voting not guilty. And the revealed that one jurors rationale being that they had found reasonable doubt as to the charges. If they know the district court, no, though, which juror was the holdout juror? I do not know if that was not stated in open court. If Judge Ilsen was able to figure out which one that was, it's possible, but that was never established. But there's nothing in the record that suggests that the district court knew specifically which juror was the holdout juror. That's correct, your honor. But I would like to emphasize that after that note was in the hands of the trial court, that one juror then knew that the court knew that it was to one split with that one juror on the, I guess, on the short end of that debate. And I moved that the note was turning around 3.30, the end of one day of deliberation. We returned the next morning and I promptly moved for mistrial and the trial court did not grant that motion. And because the trial court knew of the numerical division and because the jury was all aware that the judge knew of that and sent them back anyway, it is inherently coercive. And the language by Judge Ilsen was such that if you guys are able to reach a unanimous verdict, we would like you to and 11 were guilty. There was no conceivable way that that one jury, that one juror would have, a la Harry Fonda, convinced all other 11 and amounted to 12 votes for not guilty. The only way the jury under these circumstances, which we were all aware of at this point, could result in a unanimous verdict is if that one not guilty juror changed his vote, which he was entitled to hold, and then change his vote to conviction. Because that was the only foreseeable outcome under the court's instruction. Well, that's not the only foreseeable outcome. The other foreseeable outcome was that the single juror would, you know, continue to believe and lead to mistrial. Yes, Your Honor, I meant the only foreseeable unanimous for unanimous. Yes, that's what I meant. So because that was the only foreseeable that, but that was the situation that existed no matter what. I mean, the judge backed upon that, that that was a condition that came to the judge. You know, and didn't didn't both sides agree to the Allen charge that was made? That was no, I, no, I moved at the beginning, I moved for a mistrial. The judge was not inclined to grant the mistrial. And she, Judge Ilston informed us she was going to give some instruction to to the jury. I did. Since the mistrial was not going to be granted. I did attempt to influence to some degree. But you're but I guess the question then is, what is the issue before us? What's the standard of review? Because the objection was made based on the facts that were there. But but as to the instruction, because you sort of started to suggest that the instruction itself was coercive, but that would have to be reviewed for plain error, if that right, because you you agreed to the instruction at the end of the day. Well, I did not agree to any instruction being given because my request was for a miss for a instruction. Did you? Did you object to the to the to the phrasing of the instruction? I did not lodge a second objection to the language that was given. I my position wasn't is no instruction should have been given. Any instruction is inherently coercive. When we're in a circumstance where the judge knows the numerical split, and the votes of the of the every judge tells every jury, if you if you're a deadlock, do not tell me the numerical split to avoid a situation like this. But in in violation, that jury that jury instruction wasn't in the initial instructions that meet meaning that the jury ignore that instruction. Yes. So the what if the instruction was don't tell me the numerical split, if you're deadlocked, but then the jury came in and pulled up. I believe, Judge, in the standard instructions that go to all juries, where they say only contact me by written note through my bailiff, you'll be somewhere secure. I'm, I'm 99% sure, as in this case, there is a standard instruction that says, if you're unable to reach a verdict, um, like, don't don't tell me the the some some version of yeah. Okay, don't don't tell us the numbers. Yeah, so you have a number of issues here. So I don't want to belabor this. But your position is that the that the district court as soon as is it got to note saying that the we have one holdout, the district court should have declared a mistrial because he knew because she knew the split? Yes, Your Honor is what what what authority are you relying on for that position? Say, I don't want to mispronounce it. It's the United States versus say a choir. 725 fed second at 531 from this court. Okay. And the other cases cited in my reply brief. Okay. Do you want to move on briefly to the speedy trial act? I would love to, Your Honor. Okay. Regarding that issue, the Miss Santiago was originally arrested on a warrant that was sought by her probation officer in connection with what we refer to in the northern district as a form 12, which is a terms of the supervised release. And the allegation in that document was that she quote violated 18 USC section 111 assault on a federal officer, in quote. So essentially, it's a criminal complaint by a different name, as it alleges a specific criminal offense and requested Miss Santiago's arrest. And therefore, she was held on those charges, which should have, in my opinion, triggered the speedy trial clock of 18 USC section 3161, which requires any indictment to be filed within 30 days of that clock commencing unless time is right between arrest and the 75 day later indictment. Counsel, how do you address United States versus Contreras? That's our decision from 1995, where we held that an arrest for supervised violation of supervised release is not in connection with the indictment, even if they're based on the same facts. Well, Contreras. Isn't that a foreclosure argument here? I don't believe so, Your Honor, because Contreras presented a different factual scenario where the defendant was originally arrested on alleged supervised release violations separate from the facts underlying the forthcoming, the later forthcoming indictment. Specifically, I believe in Contreras originally was dirty drug tests, et cetera. They brought him into custody. They investigated other crimes they believed he might have been involved in, developed more evidence and then indicted him. But the initial detention was the initial probation violation was independent and separate from the charges of the indictment. So the defendant in Contreras was not being held in connection with the charges of the later indictment where Ms. Santiago's, the basis for her detention was the exact same charge that she was indicted on. I mean, the request for the warrant quotes 18 U.S.C. section 111, and that's what she was indicted on. So I believe it's fundamentally different than the situation in Contreras. Did you want to reserve time? Um, if I know your honor, if I could just, yeah, sure. Go ahead. Very briefly. It goes by so quickly, um, regarding the issue of, uh, specific and of the intent element of the assault theory. Um, just two points, your honor, that there are, as the court is aware, three means of committing the offense of assault on the federal officer under section 111. There's physically striking somebody, attempting to, attempting to strike a federal officer. And third, um, what's referred to as the attempt to frighten, um, theory. Uh, one of the two theories the government ultimately pursued in its case was the attempting to frighten, which is a specific intent crime, um, based on this court's, uh, precedent in Sierra Acosta and Ramos. Um, I do not believe the jury was properly instructed on that. I did request, uh, during deliberations, a supplemental instruction be given. It was not given. And, uh, I don't believe the jury was properly instructed on that theory. And last point, your honor, if I may, is, um, prior to the commencement of the trial in this case, the party submitted a joint statement to the jury. Um, and in the joint statement, the parties agreed on a small caption that would be read to the panel at the outset of jury selection. And in that caption, the parties agreed, and it was submitted to and signed off by Judge Ilston, was the government's theory of the case, which was specifically that Ms. Santiago attempted to strike Officer Laforte, uh, with her car. Um, and my position was that she denies that and she's presumed innocent. And that was read to the jury at the outset of jury selection. Um, it's my position that that statement, uh, which was in essence the government's of which of the three assault theories they would pursue a trial, uh, was binding. And when the government shifted and elected to pursue a theory in the disjunctive, either theory two or theory three of assault, um, in its rebuttal closing, um, that that was error. It was prejudicial to the defense because we did not prepare, uh, or maintain our case in a way, um, on that third theory, because the government has specifically and explicitly elected only the second theory in their statement to the jury. Um, and at a minimum, I should have been granted, sir, rebuttal, which I promptly, uh, promptly requested and was denied. And I would like to reserve the rest of my time for rebuttal. Thank you, counsel. Um, counsel for the government may proceed. Your honor, made it pleased to the court. My name is Kelly Volcar, and I'm here on behalf of the this court should affirm Santiago's conviction because the state trial act does not apply when a defendant is arrested for the supervised release violation as here. And there's no attempt by the government to gain tactical advantage through the delay. As your honor noted, Contreras is control. I believe Contreras is dispositive here. In addition, the district court's instructions on intent followed this court's binding precedent, and the government correctly explained those In doing so, the government consistently referred to two theories of assault throughout the trial, theories two and three. Finally, this court has upheld supplemental instructions for deadlock juries akin to the Allen instructions, even if the numerical split is inadvertently revealed to the district court as here, so long as the identity of the holdout juror is unknown. And your honor, judge Nelson correctly noted that there is nothing in the record here to suggest the district court ever learned the identity of the holdout juror. So, but just to be clear, if the note inadvertently had said, hey, we have one holdout juror, juror number five, then the district court would have had to declare a mistrial. That's the government's position. Correct, your honor. I think if that had been the case, this case would be indistinguishable from Williams, where that is essentially what happened. The juror self-identified in her note that she was the holdout and she had strongly held beliefs. But here I think we have a very different scenario where the identity of the person was never, was just never revealed. And although the note was signed by someone who was not the foreperson, it's clear from the numerous notes the jury submitted that multiple people, in fact, I believe was a total of four different jurors, signed notes at different points in time. And the foreperson only signed two of the six notes submitted in this case. So it's completely unclear from the face of the note whether the person who wrote it was one of the 11 or the one. And certainly nothing said on the record ever indicated that the district court knew who the holdout juror was. And opposing counsel referred to the case. I also hope I'm pronouncing that somewhere close to accurately. And I think this case is very different because in that case, the district court, after learning that there was one holdout juror, brought the jurors in and pulled them each individually to see whether they thought they could continue. One juror indicated that he or she thought there was no point in continuing. At that point in time, this court noted that it was an indication of who was the sole dissenter. And that led to the court's ruling, this court's ruling, that when the district court gave a supplemental instruction encouraging them to continue deliberating, that one juror would think the judge knows who I am. The judge is telling me that I have to reach a unanimous verdict. Contrast here, the district court's note says, we think we're at an impasse. What are our options? And the district court responds with what the options for the jurors are. We can reread back portions of the transcript. We can give you further jury instructions. We just want to know if you think there's any purpose to continuing deliberations. If you can't, you can't. That's not a problem. But if you can, we would like you to reach a unanimous verdict. And when Judge Ilsen asked the jurors to go back into the jury room to determine how they wanted to proceed, it was exactly that question. Do you want to continue with deliberations, or is this it? And to Your Honor, Judge Nelson's question of my opposing counsel, there was no objection to that language of that instruction. Instead, there was only, if the jury comes back and says nothing further is going to help us, at that point in time, both parties agreed and the court agreed, a mistrial would have to be declared. But that's not what the jury did. The jury went back to deliberating, sent out a note asking to clarify the standard of reasonable doubt, and then later asked for portions of three witnesses' testimony to be read back, deliberated for another day, and then eventually reached a unanimous verdict. And another point my opposing counsel raised that I want to respond to is that there's no way the one lone juror could have, a la 12 Angry Men, convinced the other 11. But I think, one, our system counts on that being a possibility, and two, this court's precedent shows that it is possible. In the Azubuye case, also from the early 1990s, there was a split revealed to the court, nine to three on one count in favor of conviction, nine to three on another count in favor of acquittal, and at the end of the trial, both, the jury ended up convicting on both counts. That means that three holdouts on the one count actually convinced the other nine. Now, we don't always know what goes on in the jury room, but I just pointed that as an example of the fact that the juries are deliberating and they're coming to a reasoned conclusion. So I, again, note here, as the district court found, this case is very similar to the Banks decision, authored by Your Honor Judge Ivey, and the Chanko decision. The supplemental instruction was only given once. The jurors were asked what their options were, and the district court responded with various options, which have been approved by this court, such as rereading trial testimony and rereading jury instructions. The court reminded the jury not to disclose its numerical division again, and the jury continued deliberating for another day, asked questions about what the reasonable doubt standard meant as it relates to witness credibility and the burden of proof, and also asked about, to hear further testimony. Moving on to the Speedy Trial Act claim, this court held in contrarios that the same conduct, that this court does not use the same conduct test, and so long as the person is arrested for a supervised release violation, that is a separate offense or charge from an indictment on the substantive offense. Although unpublished, the 11th and Second Circuit cases that I cited in my brief at pages 19 to 20 further elaborate on the reasoning as it relates to the text of 3161B, and they talk about the fact that it connects a charge with the offense that is asserted, and a supervised release violation is really about a breach of trust to the district court. That's why it can be, a violation can be based on something as simple as associating with a known felon, as in this case. It doesn't always have to lead, and it doesn't always lead to a substantive charge. Here it did, and what that means is that the Super, when Ms. Santiago was arrested for her supervised release violation in November of 2018, that started the Speedy, that did not start a Speedy Trial Clock. That merely related to when the hearing for the supervised release violation would occur, which is governed by the Due Process Clause. When the government filed the substantive indictment on Section 111, that started a Speedy Trial Clock, and they are two separate offenses. The only exception is if the prosecution is delaying for tactical advantage, and the district court here properly found that there was no ruse, no something more, no attempt to gain advantage. Finally, on the last issue of intent and whether or not the government changed its theories, no variance occurred. No variance occurred between the indictment and trial, and in the indictment, the government simply asserted an assault. And the next statement of what theories would be portrayed was the jointly prepared jury instructions, which listed all three theories of the assault in the disjunctive. Both parties agreed to this court's model jury instruction, which is correct based on the law of this circuit. Other than the statement of the case, which was meant to just be a brief statement given to the entire veneer before the jury was empaneled, the prosecution consistently referred to two theories of assault throughout the trial. Indeed, the jury even asked if a lower mens rea would suffice during deliberations, asked if reckless disregard would suffice to convict Ms. Santiago, and the court unequivocally said no. If the panel has no further questions, the United States respectfully requests this court affirm on all counts and is prepared to sit on our brief. Thank you, counsel. And we'll give Mr. Guzman, you have, looks like just under two minutes for rebuttal. Thank you, Your Honor. Taking the government's point first, if I may, the jury did ask or send a note regarding would recklessness be enough. And Judge Ilston did not reply no. She re-read or referred the court, she either referred the jury to the model instruction or re-read the model instruction, which in and of itself does not, to a jury, might not clarify specific intent, especially when you consider the way that instruction is written. So she did not say no, recklessness is not high enough, you must make a finding on specific intent. She just referred the jury to the model instruction. Secondly, Your Honor, it is, the opposing counsel repeatedly said that no variance occurred and, but a variance did occur, Your Honor. The jury was not read at the outset of the case, all the model instructions or many of the things that the party submitted in the joint statement, but they were read the statement of the case, which had the government's theory, which was their theory, what they believed was that my client, Ms. Santiago, attempted to strike Deputy Laforte with her car, which is the second form of assault under Section 111. And their case was not consistently arguing both the second and third theory of assault, it argued the second theory. And while some of the evidence they garnered could have applied to both theories, the government often is very thorough in its presentation of evidence, but the theory that they elected and what was read to the jury was the second theory, and that was the theory, the defense. But is it, is it, excuse me, counsel, is it your position here that you, you told the judge that they had argued another theory, a different theory, and what, what you wanted was another opportunity to address the jury? Yes, during the government. Yeah, I'm sorry. So you, you wanted, you wanted to be able to respond to the government's argument? Is that what, what you asked the district court? I did request a rebuttal, yes, your honor. Yeah, and the district court denied it. That is correct. Had been the theory throughout the case. You know, it's really kind of hard to think of anything more discretionary on the part of a district judge than, than that kind of decision. I understand. If I could just make two, two last brief points, your honor. Well, you're, you're over time. If you, if you can sum up, I think we have a pretty good grasp of the argument, so. Thank you, your honor. If you want to sum up, go ahead. I would direct the court to page 334 of the excerpt of record during the government's first where they clearly are arguing the second theory of assault. And regarding the intent requirement, I believe it was not properly explained because I argued it was specific intent. The government in its rebuttal closing said, Mr. Guzman argues specific intent, but that's not a correct statement of the law. And then quotes the model instruction, which has the effect of saying specific intent is not the correct level of intent to apply. That's at 362 of the excerpt of record. Thank you very much. Okay. Hey, thank you. Thank you to both counsel on this case. The case is now submitted and we will turn to our final case set for argument today. US WeChat users Alliance versus Donald J. Trump case number 20-16908.
judges: Schroeder, Bybee, Nelson